<u>AFFIDAVIT IN SUPPORT OF WARRANT</u>

I, Special Agent Alejandro Urzua, being duly sworn, depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for seizure pursuant to Title 21, United States Code, Sections 853(e) and (f), and Title 18, United States Code, Sections 982(a)(1) and (b)(1) concerning violations of Title 18, United States Code, Sections 1341, 1956, and 1957 and Title 21, United States Code, Sections 841 and 846 for the following: Bitcoin wallet bc1ql993stvxs8yazsxyxahwfaf3fdrfyp5w7wxkun (bc1ql993) referred to hereafter as **Subject Wallet 7,** held in the Gemini exchange.

2.      That I, Alejandro Urzua, am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since January 2022. I am a 17-year veteran of law enforcement and have been employed as a federal law enforcement officer for over 17-years. I am currently assigned to the DEA Tucson District Office in the Phoenix Field Division to investigate violations of the Controlled Substance Act.

3.      I attended DEA Basic Agent Training in 2022 at the DEA Training Academy in Quantico, Virginia. The 17-week training course included classes on the investigation, detection and identification of Controlled Substance Act violations; the methods of operation of Drug Trafficking Organizations (DTOs); and the practices for interviewing witnesses, cooperating individuals, and others who may have knowledge regarding controlled substances.

4.      Previous to employment with the DEA, your Affiant was employed as a federal agent with the United States Border Patrol (USBP) from 2007 until 2022. I completed the USBP Academy based at the Federal Law Enforcement Training Center (FLETC) in

Artesia, New Mexico and received approximately 12 weeks of specialized training at FLETC. As a Border Patrol Agent, I was assigned to intelligence units where I participated in numerous human smuggling and narcotics investigations. I also worked with different federal, state and local agencies to assist in those investigations.

5. I have received extensive field training of narcotics and the methods and practices of DTO's. I have attended numerous law enforcement courses and have been trained to observe and detect the common actions of narcotics traffickers and their co-conspirators in overt acts to further the commission of their crimes. I have taken part in numerous criminal investigations which have led to the successful arrests and convictions of those being investigated.

6. I state that the Drug Enforcement Administration is conducting this investigation. I am fully familiar with the facts and circumstances of this investigation, with such familiarity having been gained through my personal knowledge based upon participation of this investigation, statements made to me by other law enforcement officers and/or personnel, and review of records and documents.

7. For the reasons detailed below, I believe that there is probable cause to believe that **Subject Wallet 7**, contains evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(manufacturing, distributing, or dispensing, or 846 (attempt or conspiracy to traffic in or possess a controlled substance), and Title 18, United States Code, Sections 1341 (mail fraud), and 1956 and 1957(money laundering) (the "Subject Offenses").

## **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

8. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement officers, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other electronic or digital devices, and in their residences. I also know that electronic and digital devices are also used as access points for collection and distribution of illegal proceeds in both bank and cryptocurrency accounts.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other electronic and digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have

photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.      Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their electronic or digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their electronic or digital devices and in their residence, including in the form of calendar entries and location data.

        e.      Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

        f.      Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash or cryptocurrency basis. Such currency or access to such currency is often stored in their residences and vehicles. Access to cryptocurrency is stored on electronic devices such as I-pads, electronic wallets, computers, or cellular smart phones.

        g.      Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

4

  h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications. Drug traffickers also use other electronic devices to store, access, and utilize proceeds of their crimes.

## BACKGROUND ON THE ILLICIT SALE OF STEROIDS ON THE OPEN WEB AND THE USE OF CRYPTOCURRENCY

9. The Open Web is the accumulated and indexed websites available without the use of password or anonymizing software. This is the internet we use on a regular business and where websites are reached by entering the web address or through a search engine. Illicit steroid use and sale are discussed on numerous online forums and online body building communities. In these forums users discuss websites where they are able to purchase illicit steroids and discuss the quality of products. By viewing these discussions, we are able to identify specific websites selling illicit steroid and diverted pharmaceuticals.

10. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.

11. Cryptocurrency can exist digitally on the internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and

5

private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.

12.     Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.

13.     Generally, cryptocurrency is not issued by any government, bank, or company. Instead, cryptocurrency is generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.   Cryptocurrency is not illegal in the United States.

14.     Bitcoin  ("BTC") is a type of cryptocurrency.  Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity.  As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies that allow individuals to buy or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a

blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And although bitcoin transactions are not completely anonymous, bitcoin does allow users to transfer funds more anonymously than traditional financial transactions.

15. Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and then generate, store, or generate and store public and private keys used to send and receive cryptocurrency.  A public key, or public address, is akin to a bank account number. A private key, or private address, is akin to a PIN number or password that allows a user to access and transfer value associated with the public address or key.

16. To conduct transactions on a blockchain, an individual must use the public address as well as the private key.  A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of a public address's private key can authorize any transfers of cryptocurrency from that cryptocurrency public address to another cryptocurrency address.

17. Each private key and/or wallet can control multiple public addresses. These groupings of public addresses associated with one private key or wallet are referred to as

address clusters. These linked addresses can be identified by investigators through co-spend and change transactions shown on the blockchain. A co-spend is a transaction in which two or more blockchain addresses send a balance to an additional blockchain address, which indicates that the multiple sending addresses are associated with the same wallet or private key. A change address is a blockchain address that receives the remainder of cryptocurrency sent to an additional address in a transaction. As the Bitcoin cryptocurrency protocol necessitates sending an address' entire balance in any transaction, the amount not intended to be deposited is returned to the sender as change. These change addresses can be attributed to the sender's private key or wallet.

18.     Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is frequently used by individuals and organizations for criminal purposes, such as to pay for illegal goods and services – via, for example, hidden services websites operating on the Tor network.

19.     Cryptocurrencies can also be used to engage in money laundering.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the DNMs.

20.     A cryptocurrency user can store and access wallet software in a variety of forms, including via:

- a PC or laptop ("desktop wallet"),

- a mobile application on a smartphone or tablet ("mobile wallet"),

- an internet-based cloud storage provider ("online wallet"),

- an online account associated with a cryptocurrency exchange ("online account"),

- a tangible, external device, such as a USB thumb drive ("hardware wallet"), or
- printed public and private keys ("paper wallet").

Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g., Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code with the public and private key embedded in the code. Paper wallet keys are not stored digitally.

21. Wallets can also be backed up via, for example, paper printouts, USB drives, or CDs. Wallets can be accessed through a password or a "recovery seed" or "mnemonic phrase," that is, random words strung together in a phrase.

22. Additional security safeguards for cryptocurrency wallets can include two-factor authorization, such as a password and a phrase. I know that individuals possessing cryptocurrencies often have safeguards in place to prevent their assets from hacking, unauthorized transfer, and/or law enforcement seizure.

23. Cryptocurrency "exchangers" and "exchanges" are individuals or companies that exchange or transmit bitcoin and other cryptocurrencies for other currencies, including U.S. dollars. According to Department of the Treasury, Financial Crimes Enforcement Network (FinCEN) Guidance issued on March 18, 2013, and May 9, 2019, virtual currency administrators and exchangers, including an individual exchanger operating as a

business, are considered money services businesses ("MSBs"). MSBs, including cryptocurrency exchanges, function as regulated businesses subject to the federal Bank Secrecy Act ("BSA"). Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering (AML) regulations, "Know Your Customer" (KYC) protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity. These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% of the amount exchanged, in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%.

24. Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or

password. Users can store, receive, and transfer cryptocurrencies via the application. But many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed, or on any digital or physical backup private key that the user creates. As a result, these wallet service companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet, described above, law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and then transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

25. As of December 30, 2024, one bitcoin is worth approximately $92,000 US Dollars (USD). But the value of bitcoin is volatile, and its value, to date, has been more volatile than that of widely accepted fiat currencies such as the U.S. dollar.

## STATEMENT OF PROBABLE CAUSE

26. Since September of 2021, Law Enforcement Officers (LEOs) have reviewed United States Postal Service (USPS) business records and learned there appeared to be a pattern of addresses and names that were related and were using prepaid postage to ship parcels from Tucson, AZ to other parts of the country. LEOs have worked together and identified that many of these parcels had suspicious return address information that

utilized similar or the same return "business" names and addresses and appeared that the sender or senders may be trying to conceal their identity. Additionally, these parcels usually use USPS Priority Mail small flat rate boxes, the return addresses are fictious, the person mailing the parcel is not the name used on the return addresses, and weights are close in proximity.

27.  On August 10, 2023, LEOs used this information, and obtained a federal search warrant for a suspicious parcel that was shipping from an address in Tucson, AZ, to a Mike Durazo in Surprise, AZ. This parcel was identified as having a fictitious name and the label had similar characteristics to labels on previously seized parcels, especially those containing steroids. From LEO's training and experience, nearly all drug and drug proceeds parcels bear tracking numbers allowing the sender and receiver to track the progress of the shipment from origination to destination and are also paid in cash or crypto to keep anonymity. On this occasion, the parcel contained a pre-paid label. Inside the parcel, LEOs located approximately 240 grams of suspected steroids. Lab analysis confirmed that the suspected steroids were indeed steroids, Schedule III controlled substances.

28.  On August 18, 2023, LEOs again used the same information and obtained a federal search warrant for another suspicious parcel that was shipped on August 12, 2023, from an address in Tucson, AZ to a Michael Howard, in Tucson, AZ. This parcel was also identified as having a fictitious name and return address, and the label had similar characteristics to labels on previously seized parcels. LEOs also checked law enforcement databases and public records but found no records associating the sender

with the listed address. Inside the parcel, LEOs located approximately 83 grams of suspected steroids.

29. On September 19, 2023, LEOs obtained a federal search warrant for another suspicious parcel with the same characteristics mailed on September 18, 2023, by this drug trafficking organization (DTO). That parcel contained 180 grams of suspected steroids. Lab analysis confirmed that the suspected steroids were indeed steroids, Schedule III controlled substances.

30. On September 21, 2023, LEOs obtained surveillance footage from the Cortaro Post Office in Tucson, AZ pertaining to the steroid seizure on September 19, 2023. The footage revealed a tall white male with an approximately foot-long white beard framed by black stripes as the shipper of suspicious parcels. Through the use of social media accounts, shipment data, and a driver's license photograph, LEOs identified Charles GILBERT (GILBERT) as the male in the video and a courier for this DTO. LEOs also obtained an image of the vehicle GILBERT used during the mailing. That vehicle was later identified as a 2014 Ram 2500, green in color with an Arizona License Plate of WZA1LP. This vehicle is registered to SUBJECT PREMISES 1, 7013 W Amarante Dr., Tucson, AZ 85743, the residence GILBERT shares with Rebekah DIETRICH (DIETRICH).

31. Since the installation of a GPS tracker on GILBERT's truck, LEOs have been able to identify co-conspirators of GILBERT, to include Jorge OLIVARRIA and multiple locations which GILBERT utilizes to further his manufacturing and distribution operation. OLIVARRIA has been observed by LEOs on several occasions shipping

packages containing steroids for GILBERT. The locations identified include SUBJECT PREMISES 2 (the original stash house and lab), a single-story tan and red house with a chain-link fence around the property and SUBJECT PREMISES 3 (a new stash house and lab), a single-story tan and white manufactured home with wire fencing around part of the property. Based on training and experience, service records, and surveillance, LEOs believe SUBJECT PREMISES 2 and SUBJECT PREMISES 3 are both being used to manufacture and store illegal steroids. LEOs have observed GILBERT and his co-conspirators arrive empty handed and leave with packages containing steroids. LEOs have also observed that other than GILBERT and his co-conspirators, no one appears to reside at SUBJECT PREMISES 2 and SUBJECT PREMISES 3.

32.  Additionally, since the installation of the first GPS Vehicle Tracker, LEOs learned that on November 6, 2023, GILBERT departed SUBJECT PREMISES 2 and mailed at least one USPS parcel at the Coolidge Post Office to a known address that received suspected steroids in the past. These parcels also had fictitious senders and similar characteristics. The recipients of these parcels also had previous shipments with similar characteristics. The following day, on November 7, 2023, GILBERT departed SUBJECT PREMISES 1 and mailed at least 13 USPS parcels at the Mountain View Post Office. Again, these parcels had a fictitious sender and had similar characteristics as previous ones to include dimensions and weights.

33.  Based on seizures and USPS business records, it is believed the USPS parcels mailed by GILBERT with the above-mentioned characteristics all contained steroids.

34. On December 5, 2023, law enforcement LEOs were conducting electronic and physical surveillance on GILBERT and observed him depart SUBJECT PREMISES 2 at approximately 6:00 p.m. and enter his Ram 2500 with a large, reusable shopping bag. Electronic surveillance showed GILBERT arriving at the Casa Grande, Arizona Post Office at approximately 6:30 p.m.

35. On December 6, 2023, United States Postal Inspector (PI) Akins utilized USPS business records to locate a parcel that was mailed by GILBERT. LEOs obtained a federal search warrant for that parcel, and it contained 200 grams of suspected steroids. Lab analysis revealed that the suspected steroids were in fact steroids, Schedule III controlled substances.

36. On February 15, 2024, GILBERT departed SUBJECT PREMISES 1 and mailed at least one USPS parcel at the Mountain View Post Office. All of these parcels contained the same characteristics, which were USPS Priority Mail small flat rate box, the return address was fictious, the person mailing the parcel was not the name used on the return address, and the weights were close in proximity to other shipments containing steroids.

37. On February 16, 2024, PI Akins utilized USPS business records to locate a parcel that was mailed by GILBERT on February 15, 2024, at the Mountain View Post Office. PI Akins obtained a federal search warrant for that parcel, and it contained 149 grams of suspected steroids. Lab analysis revealed the suspected steroids were indeed steroids, Schedule III controlled substances.

38. On April 5, 2024, LEOs began conducting surveillance at SUBJECT PREMISES 1 and were able to observe GILBERT operating a green 2023 Subaru Ascent bearing an

AZ license plate 8FA9HM.  On April 9, 2024, while conducting surveillance, LEOs were able to observe GILBERT driving the Subaru and mail at least one parcel at the Mountain View Post Office.  Subsequently, a federal search warrant was obtained for said parcel and it contained 160 grams of suspected steroids.  Lab analysis confirmed that the suspected steroids were indeed steroids, Schedule III controlled substances.

39.     On May 6, 2024, the GPS tracker installed on GILBERT's Subaru showed GILBERT departed SUBJECT PREMISES 1 and drove to SUBJECT PREMISES 3.  LEOs set up surveillance in the vicinity of SUBJECT PREMISES 3 and were able to observe GILBERT driving his Subaru.  GILBERT drove from SUBJECT PREMISES 3 to SUBJECT PREMISES 1 and parked in the driveway.  At SUBJECT PREMISES 1, one of GILBERT's co-conspirators OLIVARRIA was waiting for him in front of SUBJECT PREMISES 1.  LEOs were able to observe GILBERT standing at the rear trunk area of the Subaru with the hatch open and OLIVARRIA walking away from GILBERT's vehicle carrying two large shopping bags, one purple in color and the other brown with a Nike logo on it.  OLIVARRIA then got in his vehicle with the bags and departed SUBJECT PREMISES 1.

40.     LEOs in the area began following OLIVARRIA who drove from SUBJECT PREMISES 1 to the Mountain View Post office and dropped off multiple packages in the drop-box inside.  Once OLIVARRIA exited the Post Office, LEOs conducting foot surveillance contacted Post Office staff as well as PI Akins.  On this occasion, LEOs were able to identify 19 parcels dropped off by OLIVARRIA.  One of the parcels was selected and sent to PI Akins who requested and was granted a federal search warrant to

open the package. This parcel contained approximately 385 grams of suspected steroids. Lab analysis confirmed that the suspected steroids were indeed steroids, Schedule III controlled substances.

41. On September 12, 2024, postal employees from the Cortaro U.S. Post Office in Tucson, Arizona notified a U.S. Postal Inspector that GILBERT had mailed suspicious packages that met the indicators of earlier packages mailed by him and some seized that contained steroids, a Schedule III controlled substance. On September 23, 2024, a federal search warrant was obtained to search one such parcel shipped to JIMENEZ in Florida. Inside the parcel were 310 grams of Oxazepam, a benzodiazepine, and Schedule IV controlled substance as confirmed by a field test. On September 25, 2024, a U.S. Postal Inspectors observed video footage of GILBERT mail a parcel from the Cortaro U.S. Post Office to JIMENEZ in Orlando, Florida.

42. Although GILBERT has most recently been observed shipping illegal steroids after leaving SUBJECT PREMISES 1 and SUBJECT PREMISES 3, GILBERT still has full access to SUBJECT PREMISES 2 and has frequently visited SUBJECT PREMISES 2 since January 23, 2024. Additionally, GILBERT's travel trailer is currently being stored at SUBJECT PREMISES 2. No one other than GILBERT and his associates are seen at SUBJECT PREMISES 2. GILBERT is a tenant at all 3 premises to be searched and has unrestricted access to all of them and his illegal distributions of steroids and other controlled substances seemingly continue to the present.

43. On January 10, 2025, U.S. Magistrate Judge Maria S. Aguilera authorized the seizure of known cryptocurrency wallets 1-6 associated with GILBERT, DIETRICH,

OLIVARRIA, and JIMENEZ with three separate currency exchanges. The GILBERT DTO would from 2022 utilize the surface website PharmaHGH.net to advertise steroids for sale and receive orders for steroids from customers throughout the United States. PharmaHGH.net customers would pay the website in cryptocurrency and then those proceeds would be sent to known cryptocurrency wallets associated with the GILBERT DTO from PharmaHGH.net minus any handling fee. On January 14, 2025, those seizure warrants were executed.

44. On January 10, 2025, U.S. Magistrate Judge Maria S. Aguilera also authorized the search of Subject Premises 1 (GILBERT and DIETRICH's residence), Subject Premises 2 (The Coolidge stash house and steroid lab), and Subject Premises 3 (the new stash house and steroids lab). On January 14, 2025, LEOs executed those subject premises search warrants. Currency, steroids, and other related items were seized from Subject Premises 1. Subject Premises 3 contained the new steroids lab, steroids, packaging material, and numerous rifles and handguns.

45. Following the immediate service of search and seizure warrants on January 14, 2025, monitoring of wallets involved in transferring funds from the PharmaHGH website and other services used by the GILBERT DTO to its members continued for a short time.

46. On January 18, 2025, a transfer occurred involving a Bitcoin wallet bc1qej2k6ag9d0jpdd6n3q55zdxsrmpem7x52syfaj (bc1qej2). Wallet bc1qej2 was funded in a transaction chain involving the ChipMixer cryptocurrency tumblers. Funding for this wallet also came from a noncustodial exchange used by the GILBERT DTO on previous occasions, and a wallet observed receiving funds from PharmaHGH.net wallets that

transferred funds to members of the GILBERT DTO for the sale of steroids. PharmaHGH.net was used by the GILBERT DTO to advertise and sell steroids to customers in exchange for cryptocurrency payments. The payment chain leading to bc1qej2 also included transfers to GILBERT, DIETRICH, JIMENEZ, and OLIVARRIA. The amount of funds transferred from bc1qej2 on January 18, 2025, was $52,386. These funds were combined with funds from an, until the time of this transfer, unknown holding wallet. The unidentified wallet, (bc1qyug) had $86,533 transferred on January 18, 2025. This wallet was funded by a single inbound transfer from the ChipMixer cryptocurrency mixer/tumbler on August 19, 2022. This transaction transferred funds to two receiving wallets. One of these receiving wallets bc1qwzjvdxqmjv6wxm66dtvk8gqp4scfq00tjf9psz (bc1qwzj) received a total of $64,863 on January 18, 2025. A short time later wallet bc1qwzj transferred these elsewhere and the current balance of wallet bc1qwzj is zero. The second receiving wallet was **SUBJECT WALLET 7**. **SUBJECT WALLET 7** received $74,055 on January 18, 2025. These funds remain in **SUBJECT WALLET 7.** These funds came from sources used by the GILBERT DTO in the past to pay or transfer funds to members of the GILBERT DTO involved in the sale and distribution of steroids from PharamHGH.net. **Subject Wallet 7** is funded in a similar manner to Subject Wallets 1-6 whose contents were seized pursuant to seizure warrants on or soon after January 14, 2025.

## CONCLUSION

63.    Title 21 U.S.C. § 853(f) specifically provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the

property to be seized would, in the event of conviction, be subject to forfeiture and that a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture." A protective order under 21 U.S.C. § 853(e) would not be sufficient to assure that **SUBJECT WALLET 7** will remain available for forfeiture, because there is a substantial risk that **SUBJECT WALLET 7** will be withdrawn, moved, dissipated, or otherwise become unavailable unless immediate steps are taken to secure them at the time the requested seizures are executed.

64. I submit that this affidavit supports probable cause for a warrant to seize **SUBJECT WALLET 7** described herein

65. I respectfully request that the Court:

a. Grant authorization for law enforcement agents to seize Bitcoin wallet bc1ql993stvxs8yazsxyxahwfaf3fdrfyp5w7wxkun (bc1ql993) **SUBJECT WALLET 7** based on the above facts as proceeds of illegal drug distribution.

I declare under penalty that the foregoing is true and correct to the best of my knowledge, information, and belief.

FURTHER, your affiant sayeth not.

ALEJANDRO URZUA
Digitally signed by ALEJANDRO URZUA
Date: 2025.02.04 15:25:02 -07'00'

Alejandro Urzua
Special Agent
Drug Enforcement Administration

Subscribed and sworn to telephonically this  4th  of February, 2025.

Hon. Lynnette C. Kimmins
United States Magistrate Judge